HATTIE JACKSON, The (UNITED STATES v.). See Case No. 15,327.

HATTIE ROSS, The. See Case No. 2,598.

HATTIE ROSS, The (CHAPIN v.). See Case No. 2,598.

═══

## Case No. 6,218.

### HATTON et al. v. The MELITA.

[3 Hughes (1880) 494; 3 Balt. Law Trans. 133 (No. 17).] [1]

### District Court, D. Maryland.

MARITIME LIENS—PRIORITIES—ADJUSTMENTS.

The relative priorities and dignities of many claims upon the same vessel asserted by libels and petitions, composed, adjusted, and settled in a careful opinion by the court.

[Cited in The Brantford City, 29 Fed. 386; The Scotia, 35 Fed. 909.]

[This was a libel by Edward Hatton and others to recover for supplies and repairs furnished to the schooner Melita.]

GILES, District Judge. The original libel was filed in this court by Messrs. Hatton and others, of the city of New York, on the 30th January, 1869, against the said schooner, to recover the sum of $445.10 for supplies furnished said vessel, in October and November, 1868. The libel states that said vessel belonged to citizens of Great Britain, residents of Nova Scotia. The vessel at that time was in the custody of the sheriff of Baltimore city, under an attachment issued out of the superior court at the instance of James P. Melledge and others, mortgagees, which was not released until the 16th of February, 1869, when the marshal took possession of her under the process served in this case. Before this process was served, six other libels were filed in this court against said schooner: one, on the 11th of February, 1869, by Timothy L. Mays and Nathaniel Tarr, of Boston, to recover the sum of $37.40 for supplies furnished said schooner in October, 1868; one by Robert Miller, of Boston, to recover $30 for repairing the sails of the said vessel in March, 1866; one by Dicks & Potter, of Boston, on the 11th of February, 1869, to recover the sum of $200 for sails furnished to said vessel; one by Loud & Co. of same date to

recover the sum of $57 for supplies furnished said vessel in January 1869, in this port; one by William D. Beckford to recover the sum of $993.55 for supplies furnished said vessel in 1866 and 1867, at Boston; and one by the mate and seamen to recover the wages due them for services on said vessel. Besides these libels, several petitions were filed in this case by materialmen, claiming to have liens on said vessel, and praying to be made parties to this case. They are David B. Small, Kelsey, Gray & Co., and others, and this court, by its order passed the 17th of March, 1869, ordered all these libels and petitions to be consolidated with this case. Previously to that, on the 19th of February, 1869, this court, on the petition of libellants, and with the consent of said creditors and of the captain and half-owner of said vessel, passed an order for the sale of the said vessel, and which was carried into execution by a sale of the said vessel by the marshal on the 27th day of February, 1869, and the net proceeds of sale, to wit, the sum of $3,641.57 were deposited in the registry of the court, to await its future order. On the 27th of March, 1869, the court passed a decree in case of the mate and seamen against said vessel, in their favor, ordering that the sums adjudged by the said decree to be due to them should be paid to them out of the proceeds of the sale of said vessel in the registry of the court. The amount thus paid was $727.29, leaving only the sum of $2,914.28 to meet all the other claims made against said vessel. Besides these claims, a claim was filed by the captain of said vessel for wages due him, which he claimed to be a lien on said vessel by the laws of Great Britain; and a claim was also filed by Messrs. Tucker & Co., of this city, for damages which they suffered by the delay in delivering a cargo shipped by them on board said vessel on the 23d day of January, 1869, to be transported to Trinidad, in the West Indies, and which was not delivered until the 4th of April, 1869, owing to the fact, that the vessel did not leave this port until the 4th of March, 1869, more than a month after the time she should have sailed. A claim was also filed by Messrs. Melledge & Co., of Boston, to recover the sum of $2,165.40, balance due them for supplies, and furnished to said vessel at various times from 1864 to 1869, and for which they held a mortgage of said vessel, and also an agreement with her captain and half-owner, by which they received the freights of said vessel. The mortgage was executed the 27th of January, 1868; and is made to secure the payment of $3,800 alleged to have been loaned to the owners of said schooner by the said Melledge & Co. And the agreement bears date the 7th of July, 1868.

As all these several claims amount to much more than the balance of the proceeds of the sale of the said vessel, it becomes necessary for the court to marshal the assets and to decide who, if any, of these various claimants

─────

[1] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission. 3 Balt. Law Trans. 133 (No. 17), contains only a partial report.]

are to be preferred, and to have priority in the distribution of these assets. The questions growing out of these facts have been argued with great ability by the learned counsel representing the various claimants. It has been contended on the part of the claimants, Messrs. Tucker & Co., that the captain, who was one-half owner of the said schooner, has no lien against any of the claimants, and this is the first question that presents itself in the consideration of this case. As captain he contracted for the supplies made to this vessel, and as half-owner he is liable in solido for the amounts severally due to the various materialmen who are claimants in this case. He also made the contract of affreightment with the Messrs. Tucker, and as owner is responsible to them for its due performance; I therefore hold, that although by the present law of England he as captain would have a lien for his wages, yet as in this case he is also one-half owner, he has no lien as against the creditors I have named. The second question is, have the mortgagees, Messrs. Melledge & Co., any lien? Now, although mortgagees have no standing in a court of admiralty, to enforce their mortgage claim by original libel, yet they may be allowed payment out of surplus funds in admiralty, for the proceeds of a mortgaged vessel, sold by decree of the court. But this is only allowed after the payment of all prior liens on said vessel. And I held, in 1855, in the case of Reeder v. The George's Creek [Case No. 11,654], that subsequent liens obtained by materialmen for necessary supplies or repairs took priority over a prior recorded mortgage. Now although a part of the amount secured by the Messrs. Melledge & Co. was for supplies furnished to the said vessel, yet upon an examination of their account filed by them it will be found that said amount is fully paid by the cash and freights received by them, the balance of said account being for charges for material and commission, which under no circumstances of the case could ever be held a lien on the vessel. Indeed, it is doubtful whether, independent of the mortgage, Messrs. Melledge & Co. would have any lien on said vessel or its proceeds for any part of their said claim, or that this court would have jurisdiction of such a case, as the account shows them to have been the general agents and factors of the owners of said vessel. See case of Minturn v. Maynard, 17 How. [58 U. S.] 477. Their petition, like that of the captain's, must also be dismissed. We come now to the next question, have the materialmen any lien for their supplies and repairs? Libellants reside in New York, where the supplies charged for in their account were furnished to the said vessel, belonging to New Brunswick. Several of the other materialmen reside in Boston, where certain other supplies were furnished, and others reside in our city. The supplies furnished by those materialmen who reside in New York and in Boston were furnished to said schooner on previous voyages from New Brunswick to Boston and New York; and the supplies furnished by the claimants who reside in this city were furnished a short time before her seizure and sale in this case, to fit her for her then contemplated voyage. The amount due to these last is as follows:

| | |
|---|---:|
| To Messrs. Kelsey & Gray.... | $ 24 17 |
| To John Hermon.............. | 12 95 |
| To Lander & Waddy.......... | 11 83 |
| To Loud, Claridge & Co...... | 56 90 |
| To David B. Small.............. | 16 00 |
| To William Harris............ | 3 75 |
| To C. H. Lange............... | 4 00 |

$129 60 in all.

All these supplies are proved to have been necessary and proper at the several times they were furnished, and that they could only have been procured by the credit of the vessel. Are they a lien upon the vessel? The learned counsel for Messrs. Tucker & Co., with their usual ability, have argued that, although these supplies were furnished in an American port where the general maritime law prevails, yet, inasmuch as this was a British vessel, there is no implied lien on it. That the lien only arises from the power of the master to make or create it, and as by the laws of England he possesses no such power save by a bottomry bond, there was no tacit lien in this case. I take a different view of the law. The first question is, By what law is this to be decided? By the law of the domicil of the owner, or by the lex loci contractus? Says Justice Story, in his great work on the Conflict of Laws (a work not only the most learned, but at the same time the most practical of any I have ever read), in section 322, in which he is treating of the effects of contracts, that "they, like the validity of contracts, are dependent upon and are to be governed by the lex loci contractus." And after enumerating various cases which are thus governed and controlled, he says, "In these and the like cases, where the lien or privilege is created by the lex loci contractus, it will generally though not universally be respected and enforced in all places where the property is found, or where the right can be beneficially enforced by the lex fori." And in section 401 he says, "That by the general maritime law, acknowledged in most if not in all commercial countries, hypothecations and liens are recognized to exist for seamen's wages, and for repairs of foreign ships, and for salvage." And in section 402 he says: "Upon the general principles already stated, as to the operation of contracts, and the rule that vessels have no locality, it would seem that these privileges, hypothecations and liens, ought to prevail over the rights of subsequent purchasers and creditors in every other country." Until recently in England the court of admiralty, being restrained by the jealousy of the common-law courts, could not enforce such liens. But by the statute of 3 & 4 Vict. (chapter 65, § 6), that court has now ample jurisdiction over such cases. And this was the

view taken of the law by the supreme court in the case of The General Smith, 4 Wheat. [17 U. S.] 438. Justice Story, in delivering the opinion of the court in that case, says: "Where repairs have been made, or necessaries have been furnished to a foreign ship, or to a ship in a port of the state to which she does not belong, the general maritime, following the civil law, gives the party a lien on the ship itself for his security, and he may well maintain a suit in rem in admiralty to enforce his right." It would be a useless waste of time to cite the many decisions at the circuits in which the courts have acted upon and enforced this view of the law.

In opposition to this principle, I have been referred to only three cases: one in England and two in this country. First, as to the one in England,—Stainbank v. Fenning, 6 Eng. Law & Eq. 412 (and there is a similar case, growing out of the same transactions, reported in 20 Eng. Law & Eq. 547). These cases, which are alluded to by Justice Curtis in the case of Thomas v. Osborn [19 How. (60 U. S.) 22], also cited by the counsel, were actions on policies of insurance; and the question was whether the plaintiffs had an insurable interest in the vessel under the assignment executed by the captain? He undertook to convey the vessel as a security for repairs and supplies furnished in Canada to this vessel, whose owners resided in England. It will be seen, that where the supplies were furnished, as well as where the owners resided, the laws of England prevailed. But, says Judge Curtis, in full view of the only other case cited,—Pope v. Nickerson [Case No. 11,-274]: "Neither of those learned courts considered what should be the effect, in an English tribunal, of the law of the place where the repairs and supplies were obtained, if that law tacitly created a lien on the vessel." It will be found on examining the case of Pope v. Nickerson [supra], that it was an action of assumpsit on four bills of lading signed by the master of a schooner belonging to the defendants, for fruit, and were shipped on board of her at Malaga, and consigned to plaintiffs at Philadelphia. No such question as the one I am discussing arose in the case. The question was, "By what law were the bills of lading to be governed as to their obligation and extent upon the owners," whether by the law of Spain, where the contracts of shipment were made, or by the law of Pennsylvania, where the goods were to be delivered, or by the law of Massachusetts, where the owners resided, and to which the vessel belonged? And that learned judge, after a long and full discussion of the question, arrived at the conclusion, that the extent of the responsibility of the owners was to be measured by the law of Massachusetts, and not by the law of Spain or Pennsylvania. This case is so different from the one I am now to decide, that I shall not further consider it. The same learned judge, in the case of The Jerusalem [Case No. 7,294], (very early

in that judicial career which reflected so much credit on himself and the high tribunal in which he sat), had maintained the same principle of admiralty law which he enunciated in 4 Wheaton. He says: "It will be recollected that this is a foreign ship, and that by the general maritime law, every contract of the master for repairs and supplies imports an hypothecation." Says Chancellor Kent, in his great work (3 Kent, Comm. marg. p. 168): "The civil law and the law of those countries which have adopted its principles, give a lien upon the ship, without any express contract for such a claim, to the person who repairs or fits out the ship, or advances money for that purpose, whether abroad or at home. The English law allows of such a lien, from the necessity of the case, for repairs and necessaries while the ship is abroad, but it is not adopted as to repairs and supplies furnished at home." And in support of this principle the learned chancellor refers to many decisions in the English courts which fully sustain him. I hold, therefore, in this case that the rights of these materialmen are to be judged of by the general maritime law which is recognized and adopted in our American courts. And by that law, as I understand it, the repairs and supplies furnished to fit this vessel for her last voyage have a priority over the claim for repairs and supplies furnished to fit the vessel for previous voyages. We come now to consider the last question, have the Messrs. Tucker any claim to the proceeds now in the registry? The facts out of which their claim arises, are briefly these:

On the 23d of January, 1869, they shipped on board said vessel a cargo of flour and other articles to be carried for them to Trinidad, one of the West India Islands, and they paid on account of the freight the sum of $319, gold. Owing to the attachment and subsequent sale of the vessel hereinbefore stated, she did not leave this port until the 4th of March, 1869, and only reached Trinidad on the 4th of April, 1869. She was bound to have sailed with all reasonable dispatch. If she had sailed on the 24th of January, she ought to have arrived at Trinidad about the 23d of February. She lost more than a month by the delay. The cargo would have sold for much more money, had she sailed and arrived in due time, than it brought on the 4th of April, 1869, on its arrival. And for this difference with interest the Messrs. Tucker file their petition. Had they a lien on the vessel? No one can doubt that. By all the writers on admiralty law it is recognized. Says Parsons, in his last work on Shipping and Admiralty (volume 2, p. 251): "The owner of the cargo has a lien on the ship for any injury he may sustain by the fault of the ship or the master." But it is contended by the learned counsel for the libellants, that the Messrs. Tucker had no right to let their cargo remain on board so long while the vessel was in the custody of the marshal; that

they ought to have procured another vessel. Now it is perfectly clear by all the principles of law applicable to such a case, that they had no right to consider the voyage as broken up until the sale by the marshal. This took place on the 27th of February. Up to that time they had every reason to believe, from the daily representations of the captain, that the vessel would be released, and proceed on her voyage. When the sale took place the voyage was broken up, and the owner was bound in good faith not to let his cargo remain here any longer, and subject the shipowner to any additional damage. Now, under this obligation, did not the Messrs. Tucker do the very best thing they could to expedite the delivery of their cargo at Trinidad? It was then on board the Melita. It would have taken in all probability more than five days to have procured another vessel, and transshipped the cargo. The Melita had to be supplied with some new sails, which took four days, and on the morning of the fifth day, after the sale by the marshal, she departed for Trinidad. I think the Messrs. Tucker have a valid claim upon these proceeds in the registry for whatever damages they may be found to have suffered by the delay I have mentioned, with interest from the 4th of April, 1869, to the date of the decree. Now what is the measure of damages in such a case? Says Parsons, in the work to which I have already referred (volume 1, p. 271): "In an action against a carrier for undue delay in the delivery of goods, where they had fallen in value from the time when they ought to have been delivered, it was held that the diminution of value could be recovered as damages." The same rule is held in Arthur v. The Cassius [Case No. 564]; 6 Ohio, 358; and 12 Serg. & R. 188. Have the shippers any priority over the materialmen? As between them and the Baltimore claimants this question is not necessary to be raised, as there will be money enough to pay both. And from what I have already said, it is perfectly clear, to my own mind at least, that they both have priority over the New York and Boston claimants, who claim for supplies furnished to this vessel on previous voyages.

But it may be interesting to the profession to know that there is very high authority for the principle that the shipper, under the circumstances of this case, would take precedence in payment, next to the seamen for their wages. Judge Ware, in the case of The Rebecca [Case No. 11,619], and Judge Betts, in the case of Juste Pon v. The Arbustci [Id. 7,589], recognize this doctrine. It only remains for me from the evidence to ascertain the damages due to the Messrs. Tucker. They have examined two witnesses in Trinidad: one, George Spiers, the consignee of the cargo; the other, William Norman, a merchant of Trinidad. The estimate of Mr. Norman does not embrace all the articles of the cargo. Mr. Spiers makes the difference be-

tween what the cargo would have sold for on the 15th of February, 1869, and what it brought on the 4th of April to be $1,173.30 in gold. But then my impression is, that we must allow at least thirty days for the voyage from this port to Trinidad, as that was the time actually consumed, so that she should have arrived out on the 23d of February; and we must take the prices of that date, as compared with what the cargo brought on the 4th of April. I have, therefore, made a close examination of the price-currents filed with the commission from Trinidad, and I think I shall be right in allowing the loss of the Messrs. Tucker to be $1,000 in gold, to which add the freight prepaid, $319, and we have the sum of $1,319 due the shippers on the 4th of April, 1869; now add nine months and twenty days interest to that sum, and we have the sum of $1,382.50 due them on the 24th of January, 1870. Now the shipowners would have the clear right to tender to the shippers on the day of the trial of this case that amount in gold; and if this was an action in personam, the decree of this court would be for that amount in coin; but as the funds in the registry of this court are in currency, and out of that fund the shippers must be paid, I must decree that they be paid such a sum in currency as will represent the amount due them in gold on the day of the decree. At the price of gold yesterday (121⅜) that sum will be $1,681.47. To this add the costs of their commission. After these sums are deducted, as also the several sums due the Baltimore claimants and the costs of this case, the balance of the moneys will be distributed among the other claimants ratably.